**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |  |
|---|---|---|
| _____ | ) | |
| AMERICAN BANKERS | ) | |
| ASSOCIATION; and WASHINGTON | ) | |
| FEDERAL, N.A., Individually and on | ) | |
| Behalf of All Others Similarly Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:17-cv-00194-SGB |
| | ) | Chief Judge Susan G. Braden |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

PARTIES ....................................................................................................................... 3

STANDING .................................................................................................................... 4

BACKGROUND ............................................................................................................ 5

    A.    The Federal Reserve System ..................................................................... 5

    B.    Federal Reserve Bank Stock and the Guaranteed Six Percent Annual Dividend......... 7

    C.    Washington Federal's Contract with the San Francisco Reserve Bank to Acquire Stock Earning a Six Percent Annual Dividend ..................................................... 8

    D.    The FAST Act Provision Changing the Agreed-Upon Dividend Rate, Resulting in Lower Dividend Payments, to Pay for the Government's Investments in Transportation Improvements ............................................................................................... 13

    E.    The Government's Breach of Its Contracts with Member Bank Stockholders by Making Lower Dividend Payments ................................................................... 15

CLASS ALLEGATIONS ............................................................................................. 17

COUNT I (Breach of Contract) .................................................................................... 19

COUNT II (Violation of Implied Duty of Good Faith and Fair Dealing) .................... 20

COUNT III (Violation of Takings Clause).................................................................... 22

PRAYER FOR RELIEF ............................................................................................... 23

## **INTRODUCTION**

1.     This is a straightforward case of national importance involving agreements that are central to the nation's banking system.  In a classic bait-and-switch, the United States Government broke its promise to pay all banks that are members of the Federal Reserve System a fixed annual dividend of six percent (6%) on stock purchased in one of twelve regional Federal Reserve Banks.  That six percent dividend had been guaranteed to member bank stockholders since the Federal Reserve Act was enacted in 1913, and it is memorialized in contracts between the Federal Reserve Banks and their member bank stockholders.  For more than a century, the promise of a six percent dividend had induced banks to join—and to remain part of—the Federal Reserve System.  By reneging on that promise and failing to pay all member bank stockholders a six percent annual dividend, the Government either breached its contracts with those banks or failed to pay just compensation for a Fifth Amendment taking.

2.     On December 4, 2015, the President signed into law the Fixing America's Surface Transportation Act ("FAST Act"), which authorized the use of $305 billion from 2016 through 2020 for, among other things, highway, motor vehicle safety, and public transportation programs.  To fund these nationwide transportation initiatives, the FAST Act targeted financial institutions with more than $10 billion in assets—a group consisting of 72 of the nation's 5,980 banks—by permanently slashing the guaranteed six percent dividend promised to those institutions by the Federal Reserve Banks.  In particular, the FAST Act unilaterally imposed a new variable dividend rate of approximately two percent in 2016.  This lower dividend rate resulted in the transfer of approximately $1.1 billion from these targeted member bank stockholders to the United States Treasury in 2016.  The FAST Act has resulted quite literally in highway robbery, albeit by another name.

3.      This extraordinary transfer of wealth unilaterally eliminated the contractually guaranteed return on the investment of nearly $28 trillion in Federal Reserve Bank stock. Legislators critical of this arbitrary funding approach accused Congress of "taking money from banks" to "pay for our roads and bridges," even though the nation's banks (and the Federal Reserve System, in general) had nothing to do with the FAST Act transportation improvements. Indeed, the Federal Reserve System had never been raided like this in its entire 105-year history. Importantly, smaller banks (*i.e.*, those with less than $10 billion in assets) are unaffected by the FAST Act, and they continue to receive the contractually agreed-upon six percent dividend from the regional Federal Reserve Banks.

4.      Plaintiff Washington Federal, N.A. ("Washington Federal") is one of the affected banks with more than $10 billion in assets.  In 2013, Washington Federal paid more than $24 million to purchase 479,610 shares of stock in the Federal Reserve Bank of San Francisco (the "San Francisco Reserve Bank"), in exchange for the promised six percent dividend.  After Congress enacted the FAST Act, Washington Federal's dividend receipt declined significantly— from $1,439,304 in 2015 to only $502,471.53 in 2016.  This proportionate decline was shared by other affected banks.  On a nationwide basis, the Federal Reserve Banks reduced total dividend payments to member bank stockholders with assets greater than $10 billion from $1.656 billion in 2015 to only $590 million in 2016.  Many of these affected banks, including Washington Federal, are members of the American Bankers Association ("ABA").  Unless the law changes, the dividend payment rate contained in the FAST Act will apply to all future dividend payments made by the Federal Reserve Banks.

5.      Washington Federal, individually and on behalf of a class of all other commercial banks similarly situated, and the ABA, on behalf of its members that are harmed by

the Government's unilateral dividend rate cut, bring this action against Defendant for breach of contract, breach of the implied duty of good faith and fair dealing, and a taking without just compensation in violation of the Fifth Amendment to the United States Constitution.  In support of this Complaint, Plaintiffs allege the following:

## JURISDICTION

6.      This Court has jurisdiction over this action under the Tucker Act.  28 U.S.C. § 1491(a)(1).  This action is based on breach of contract, violation of the implied duty of good faith and fair dealing, and a taking of private property without just compensation in violation of the Fifth Amendment to the United States Constitution.

## PARTIES

7.      Plaintiff Washington Federal is a nationally chartered bank headquartered in Seattle, Washington and located throughout the Western United States.  It is currently, and has been since 2013, a member of the Federal Reserve System.  Washington Federal is also a member of the ABA.

8.      Plaintiff ABA is a trade association headquartered in Washington, D.C.  Since 1875, the ABA has represented the interests of the United States banking industry.  The ABA regularly advocates for policies that benefit its members and engages in litigation on behalf of its members to vindicate their legal rights and interests.

9.      Defendant is the United States, acting through the Board of Governors of the Federal Reserve System, which is an agency of the United States, and the twelve regional Federal Reserve Banks, which are instrumentalities of the United States ("Government").

## STANDING

10.     Washington Federal has standing to bring this action.  It is a member of the Federal Reserve System with over $10 billion in assets.  In 2013, Washington Federal entered into a contract with the San Francisco Reserve Bank to purchase 479,610 shares of stock in exchange for a six percent annual dividend.  In 2016, after enactment of the FAST Act, the San Francisco Reserve Bank paid Washington Federal a dividend that was substantially lower than the agreed-upon six percent dividend.  Washington Federal is entitled to damages or, in the alternative, just compensation, for the San Francisco Reserve Bank's failure to pay the agreed-upon six percent dividend.

11.     The ABA has standing to bring this action on behalf of members that received lower dividend payments after enactment of the FAST Act.  ABA members include nationally chartered and state-chartered banks with assets valued at more than $10 billion that are members of the Federal Reserve System, own stock in the twelve regional Federal Reserve Banks, were promised a six percent dividend, and are subject to the dividend reduction imposed by the FAST Act.  These members have suffered the same concrete and particularized harm that is traceable to the Government because the Government did not pay these members dividends in the amounts to which they were legally entitled.  Their injuries may be redressed by a favorable judgment of this Court.  These members would have standing to sue in their own right.

12.     This case is germane to the ABA's purposes.  The ABA is a national trade association for the American banking industry, and its mission is to protect the economic interests of its members through public policy advocacy and litigation.  Specifically, the ABA seeks, through its legal and political advocacy, to avoid burdensome regulation and policies that implicate its members.  The ABA vigorously opposed the unilateral reduction of the dividend

rate enacted by Congress and implemented by the Board of Governors of the Federal Reserve System.  In this case, the ABA seeks to protect its members' economic interests by ensuring they receive damages to which they are entitled for the Government's failure to pay the promised six percent dividend.

13.     Judicial economy and efficiency would be promoted by resolving this action without the participation of the ABA's members as parties.  ABA members with assets valued at more than $10 billion and holding Federal Reserve Bank stock have similar or identical contracts with their regional Federal Reserve Banks.  The Government promised each such bank an identical six percent dividend and reduced each bank's dividend by an equal degree.  Each bank's damages (or just compensation) are calculated in the same manner.

## BACKGROUND

### A.     The Federal Reserve System

14.     By the early part of the 20th Century, the national banking system was in crisis. National banks were repeatedly forced to suspend withdrawals as a counter-measure against financial panic that threatened to overwhelm the banking system.  Meanwhile, state banks experienced rapid growth, threatening to destabilize the banking system further because they were subject to lower capital requirements, relaxed supervision, and fewer restrictions than applied to federally regulated national banks.

15.     Congress enacted the Federal Reserve Act of 1913, which established a Federal Reserve System, to provide stability to the nation's commerce and industry, to prevent further financial panics, and to expand the availability of credit for economic growth while, at the same time, reducing the use of bank reserves for risky investments that threatened to undermine the country's banking system.

16.     The Federal Reserve Act established two components of the Federal Reserve System: the Board of Governors and regional Federal Reserve Banks.

17.     The Board of Governors exercises broad oversight responsibility for the operations and activities of the Federal Reserve Banks.  Comprised of seven presidential appointees confirmed by the Senate, the Board of Governors has statutorily enumerated powers to control a significant portion of the Federal Reserve Banks' operations.  In addition to exercising broad oversight responsibility for the operations and activities of the Federal Reserve Banks, the Board of Governors plays a major role in the supervision and regulation of the nation's commercial banks, in coordination with other federal agencies and policymakers.

18.     The twelve regional Federal Reserve Banks are the monetary and fiscal agents of the United States and the operating arm of the Federal Reserve System.  The Federal Reserve Banks operate a nationwide payments system, distribute the nation's currency and coin, supervise member banks and bank holding companies, serve as bankers for the U.S. Treasury, and provide other services to the Treasury with respect to the public debt and issuance, handling, and redemption of government securities, among other functions.  Each regional Federal Reserve Bank has a nine-member board of directors, with three of the directors appointed by the Board of Governors of the Federal Reserve.  Each Bank's Board of Directors appoints a president and first vice president subject to the approval of the Board of Governors.  The Board of Governors is also authorized to suspend or remove any officer or director of a Federal Reserve Bank.

19.     The Federal Reserve Banks are self-funded and generally profitable.  Profits of the Federal Reserve Banks, after paying necessary expenses, are deposited in a surplus fund ("Federal Reserve Surplus Fund").  When the Federal Reserve Surplus Fund exceeds a statutory

limit, the excess amounts are transferred to the Board of Governors for deposit in the general fund of the United States Treasury.

20.     The Federal Reserve Act and related laws impose substantial restrictions and requirements upon member banks compared to banks that do not join the Federal Reserve System.  Among other things, member banks face heightened capital adequacy requirements; are restricted in their ability to establish and maintain branches; and are subject to strict real estate lending standards.  Member banks are also subject to a full-scope, on-site examination by the Office of the Comptroller of Currency (for national banks) or a designee of the Federal Reserve System (for state banks) every 12 months (or every 18 months for certain small institutions).

**B.     Federal Reserve Bank Stock and the Guaranteed Six Percent Annual Dividend**

21.     To finance the Federal Reserve Banks, the Federal Reserve Act called for each Federal Reserve Bank to issue capital stock to be purchased by member banks.  Under Section 2 of the Act, banks become members of the Federal Reserve System by subscribing to stock in the Federal Reserve Bank for their district in an amount equal to six percent of the bank's paid-up capital stock and surplus, half due upon approval and acceptance of the member bank's subscription for shares of Federal Reserve Bank stock, and the remainder subject to call by the Board of Governors at any time.

22.     Stockholders' voting power is limited to the election of three directors to represent the banks and three additional directors to represent the public.  Stock in a Federal Reserve Bank cannot be sold, traded, or pledged as security for a loan.

23.     To provide an incentive for banks to subscribe to Federal Reserve Bank stock and become subject to the enhanced restrictions and requirements imposed on member banks, Section 7 of the Federal Reserve Act established a six percent dividend on paid-in capital stock.

Dividend payments were made twice per year, on June 30 and December 31, before the Federal Reserve Banks deposited their profits into the Federal Reserve Surplus Fund.

24.     From 1913 until December 2015—more than 100 years—the six percent annual dividend rate for Federal Reserve Bank stock remained unchanged.  The six percent annual return was comparable to the historical rate of return on similar investments during that period. Indeed, the six percent rate had remained consistently appropriate and yielded a fair market return over time.  Not only did the rate induce a critical mass of banks to join the Federal Reserve System, but it proved viable during all manner of economic conditions, including during the Great Depression and the post-World-War-II boom, as well as in a variety of interest rate environments, including during the double-digit rates of the late 1970s and the near-zero rates of the last decade.

25.     Banks with assets greater than $10 billion have invested a combined total of approximately $27.885 trillion in Federal Reserve Bank stock.  In 2015, the Federal Reserve Banks paid these banks approximately $1.656 billion in dividends at the longstanding and agreed-upon six percent dividend rate.

26.     As of September 30, 2016, there were 5,980 banks in the United States.  Even with the six percent dividend incentive, less than one-third of banks (1,808) have chosen to become members of the Federal Reserve System and subject themselves to enhanced regulatory oversight.

## C.     Washington Federal's Contract with the San Francisco Reserve Bank to Acquire Stock Earning a Six Percent Annual Dividend

27.     In 2013, Washington Federal elected to convert from a thrift charter to a bank charter.  A crucial aspect of the decision was whether to re-charter as a state or national bank. Ultimately, Washington Federal chose to charter as a national bank and join the Federal Reserve

System, in part because of the guaranteed six percent dividend on the paid-in capital stock. When Washington Federal joined the Federal Reserve System in conjunction with its conversion to a national bank, it entered into a stock subscription agreement with the San Francisco Reserve Bank, acting on behalf of the United States.

28.     On July 8, 2013, Washington Federal submitted an application for stock in the San Francisco Reserve Bank "in accordance with the provisions of the act of Congress approved December 23, 1913, as amended, and known as the Federal Reserve Act."  *See* Ex. A.  At the time Washington Federal submitted its application, Section 7 of the Federal Reserve Act provided—as it had since 1913—that "the stockholders of the [Federal Reserve] bank shall be entitled to receive an annual dividend of 6 percent on paid-in capital stock."  Washington Federal's application constituted an offer to subscribe to stock in the San Francisco Reserve Bank that would pay an annual dividend pursuant to those terms.

29.     On July 17, 2013, the San Francisco Reserve Bank approved Washington Federal's application and promised to pay a six percent annual dividend.  The approval document provided by the San Francisco Reserve Bank to Washington Federal confirmed the parties' agreement that "Dividends are paid at the statutory rate of *6 percent per annum*, or $1.50 per share semi-annually."  *See* Ex. B (emphasis added).  The Director of Accounting for the San Francisco Reserve Bank signed the approval document.

30.     On July 17, 2013, Washington Federal paid $24,048,444.75 as payment of: (i) 50% of the par value of the shares of San Francisco Reserve Bank stock; and (ii) accrued dividends from July 1, 2013 through July 17, 2013, calculated at a rate of six percent. Washington Federal further agreed to keep an additional $23,980,500 subject to call by the Board of Governors.

31.     On July 17, 2013, the San Francisco Reserve Bank issued an Advice of Holdings of Federal Reserve Bank Stock confirming Washington Federal's purchase of 479,610 shares of San Francisco Reserve Bank stock.  *See* Ex. C.

32.     The San Francisco Reserve Bank's approval of Washington Federal's Application for Reserve Bank Stock and its Advice of Holdings of Federal Reserve Bank Stock constituted acceptance of Washington Federal's offer.

33.     None of the contract documents exchanged between the parties includes a provision stating that the six percent dividend would be subject to change or that the contract would be subject to legislative changes to the Federal Reserve Act.

34.     An express written contract exists between Washington Federal and the United States, acting through the San Francisco Reserve Bank, as memorialized in the Federal Reserve Act, Washington Federal's Application for Federal Reserve Bank Stock dated July 8, 2013, the San Francisco Reserve Bank's letter approving the application and issuing stock dated July 17, 2013, and the Advice of Holdings of Federal Reserve Bank stock dated July 17, 2013.

35.     In the alternative, an implied in fact contract exists between Washington Federal and the United States, acting through the San Francisco Reserve Bank.  In response to the United States' offer to sell Federal Reserve Bank Stock in accordance with the Federal Reserve Act, Washington Federal subscribed to San Francisco Reserve Bank stock, and the San Francisco Reserve Bank lacked discretion with respect to the issuance of stock and the payment of dividends.  The implied in fact contract is evidenced by the Federal Reserve Act, Washington Federal's subscription to San Francisco Reserve Bank stock, Washington Federal's payment of $24,048,444.75 to the San Francisco Reserve Bank, the San Francisco Reserve Bank's issuance

of 479,610 shares of stock, and the San Francisco Reserve Bank's payment of a six percent dividend for two years.

36.     The Government demonstrated its intent to contract with Washington Federal in, *inter alia*, the Federal Reserve Act, its legislative history, statements by the current Chairwoman of the Federal Reserve, the San Francisco Reserve Bank's letter approving Washington Federal's application and issuing stock dated July 17, 2013, the Advice of Holdings of Federal Reserve Bank stock dated July 17, 2013, and the payment of a six percent dividend to Washington Federal for two years.  For example, the Federal Reserve Act invited banks to "subscribe" to Federal Reserve Bank stock, required national banks to signify their "acceptance" of the Act's terms within 60 days of its enactment, and authorized the Reserve Banks to "make contracts."

37.     There is consideration for the contract.  Washington Federal chartered as a national bank rather than chartering as a state bank or remaining a thrift, paid $24,048,444.75 for its subscription to Federal Reserve Bank stock, and agreed to become subject to the restrictions and requirements imposed upon holders of Reserve Bank stock.  In exchange, the Government, through the San Francisco Reserve Bank, issued 479,610 shares of stock to Washington Federal and agreed to pay a six percent dividend.

38.     A Government representative had express or implied actual authority to bind the United States in contract with Washington Federal.  The Federal Reserve Act expressly authorizes each Federal Reserve Bank to "make contracts" (12 U.S.C. § 341), issue "capital stock" (12 U.S.C. §§ 282, 321), and, prior to January 1, 2016, pay "an annual dividend of 6 percent on paid-in capital stock" (12 U.S.C. § 289(a)(1)(A)).  The Board of Governors of the Federal Reserve System expressly authorizes each Federal Reserve Bank to issue stock "by crediting the bank with the appropriate number of shares on its books."  12 C.F.R. § 209.2(b);

*see also* 12 C.F.R. § 209.4(c)(2).   Prior to January 1, 2016, the Board of Governors expressly authorized each Reserve Bank to pay each stockholder "an annual dividend of 6 percent on paid-in capital stock."  12 C.F.R. § 209.4(e).  The San Francisco Reserve Bank acted pursuant to this authority when it entered into the contract with Washington Federal, issued stock to Washington Federal, and agreed to pay Washington Federal a six percent dividend.

39.     The San Francisco Reserve Bank's Director of Accounting, Richard K. Cabral, acted within the scope of his duties as Director of Accounting for the San Francisco Reserve Bank when he signed the letter approving Washington Federal's subscription and the Advice of Holdings issued by the San Francisco Reserve Bank.  *See* Ex. F.  Mr. Cabral had authority to sign these documents and thus enter into the contract on behalf of the San Francisco Reserve Bank, which is an instrumentality of the United States.  Approving membership applications and issuing Federal Reserve Bank stock were integral parts of the duties assigned to Mr. Cabral as Director of Accounting.

40.     The San Francisco Reserve Bank ratified the stock subscription agreement with Washington Federal by accepting and retaining Washington Federal's payment of $24,048,444.75 through the present day.

41.     From 2013 through 2015, the San Francisco Reserve Bank paid Washington Federal the six percent annual dividend specified in the Federal Reserve Act and its contract with Washington Federal.  In 2015, Washington Federal received a dividend of $1,439,304.

42.     All member bank stockholders entered into similar or identical express and/or implied in fact contracts with the United States, acting through each of the twelve regional Federal Reserve Banks.

**D.**     **The FAST Act Provision Changing the Agreed-Upon Dividend Rate, Resulting in Lower Dividend Payments, to Pay for the Government's Investments in Transportation Improvements**

43.     On December 4, 2015, President Obama signed the Fixing America's Surface Transportation Act, or the FAST Act, Pub. L. No. 114-94, to fund surface transportation infrastructure planning and investment.  The FAST Act authorized $305 billion over fiscal years 2016 through 2020 for highway, highway and motor vehicle safety, public transportation, motor carrier safety, hazardous materials safety, rail, and research, technology, and statistics programs.

44.     The FAST Act did not include any substantive provisions addressing the commercial banking industry or the Federal Reserve System.  As one of several means of financing the transportation infrastructure initiatives contained in the FAST Act, however, Congress diverted funds from the Federal Reserve Surplus Fund as an accounting device to "pay for" the FAST Act expenditures.

45.     In order to increase revenue that could be allocated to pay for transportation expenditures, the FAST Act implemented two significant changes to the Federal Reserve Surplus Fund.  First, the FAST Act limited the size of the Federal Reserve Surplus Fund to $10 billion, which required the Federal Reserve to divert a greater percentage of the annual surplus (*i.e.*, any surplus exceeding $10 billion) to the general fund of the United States Treasury.

46.     Specifically, Section 32202 of the FAST Act provides:

> Section 7(a) of the Federal Reserve Act (12 U.S.C. 289(a)) is amended by adding at the end the following:
> "(3) LIMITATION ON SURPLUS FUNDS.—
> "(A) IN GENERAL.—The aggregate amount of the surplus funds of the Federal reserve banks may not exceed $10,000,000,000.
> "(B) TRANSFER TO THE GENERAL FUND.—Any amounts of the surplus funds of the Federal reserve banks that exceed, or would exceed, the limitation under subparagraph (A) shall be transferred to the Board of Governors of the Federal Reserve System for transfer to the Secretary of the Treasury for deposit in the general fund of the Treasury."

-13-

47.    Second, the FAST Act increased the funds flowing into the Federal Reserve Surplus Fund—and, by extension, the funds that the Federal Reserve would ultimately turn over to the United States Treasury—by substantially reducing the annual dividend paid on Federal Reserve Bank stock held by any member bank with more than $10 billion in assets.  For member bank stockholders exceeding this $10 billion asset threshold, the FAST Act required the regional Federal Reserve Banks to pay an annual dividend equal to the rate of the 10-year Treasury note or six percent, whichever is lower.  When the FAST Act was enacted, the 10-year Treasury note rate was only 2.304%.

48.    By contrast, member bank stockholders with assets below the $10 billion threshold continue to receive the promised fixed annual dividend of six percent.

49.    Specifically, Section 32203 of the FAST Act provides:

(a) IN GENERAL.—Section 7(a)(1) of the Federal Reserve Act (12 15 [sic] U.S.C. 289(a)(1)) is amended—
>    (1) by amending subparagraph (A) to read as follows:
>    "(A)  DIVIDEND AMOUNT.—After all necessary expenses of a Federal reserve bank have been paid or provided for, the stockholders of the bank shall be entitled to receive an annual dividend on paid-in capital stock of—
>>        "(i) in the case of a stockholder with total consolidated assets of more than $10,000,000,000, the smaller of—
>>>            "(I) the rate equal to the high yield of the 10-year Treasury note auctioned at the last auction held prior to the payment of such dividend; and
>>>            "(II) 6 percent; and
>>        "(ii) in the case of a stockholder with total consolidated assets of $10,000,000,000 or less, 6 percent."

50.    The sole purpose for reducing the annual dividend paid on Federal Reserve Bank stock was to reduce annual operating expenses for the Federal Reserve Banks, which has increased the annual surplus that the Federal Reserve Banks pay to the United States Treasury— all in an effort to offset the new costs of the transportation improvements contemplated in the

FAST Act having no relationship whatsoever to the banking industry. The Congressional Budget Office projected in a December 2, 2015 cost estimate that this act of "Reduc[ing] Federal Reserve Dividends" would ultimately yield $6.9 billion in new revenue for the Government in Fiscal Years 2016 to 2025.

51.     During Congressional debates, members of Congress criticized this funding approach and acknowledged that the FAST Act would result in the Government acquiring money that was rightfully due to the affected banks. One Representative aptly noted that Congress "should not be robbing the banks . . . to pay for our roads and bridges." Another Member of Congress believed "it was a mistake to tap Federal resources that have nothing to do with transportation to cover the bill's cost. Under this bill, we are funding highways in part by taking money from banks and the Federal Reserve." Yet another Representative warned that the Federal Reserve Bank Surplus Fund "is made up of the earnings that the Federal Reserve has retained from investing member banks' money," and cautioned that Congress should not be relying on "completely unrelated sectors of the economy" to fund the nation's transportation improvements.

52.     The ABA strongly opposed the FAST Act and urged members of Congress not to unilaterally alter the dividend rate that had been in place for more than 100 years.

**E.     The Government's Breach of Its Contracts with Member Bank Stockholders by Making Lower Dividend Payments**

53.     The FAST Act provisions applying to Federal Reserve Bank surpluses and dividend payments became effective on January 1, 2016.

54.     On February 26, 2016, the Board of Governors published an interim final rule in the Federal Register implementing the FAST Act by amending Regulation I and directing the Federal Reserve Banks to pay member bank stockholders with assets over $10 billion "a

-15-

dividend on paid-in capital stock equal to the *lesser* of six percent and 'the rate equal to the high yield of the 10-year Treasury note auctioned at the last auction held prior to the payment of such dividend.'"

55.     On April 28, 2016, the ABA filed comments with the Board of Governors, contending that the interim final rule is contrary to law.

56.     On June 30, 2016, the San Francisco Reserve Bank paid a dividend to Washington Federal of $204,176.17 based on a dividend rate of 1.702% per annum, which was approximately $515,598.83 lower than the dividend payment to which Washington Federal was entitled.  *See* Ex. D.  This payment breached the San Francisco Reserve Bank's agreement to pay Washington Federal a dividend "at the statutory rate of 6 percent per annum, or $1.50 per share semi-annually."  *See* Ex. B.

57.     Member bank stockholders with assets more than $10 billion also received a dividend payment on June 30, 2016 calculated based on the 1.702% rate established in the FAST Act and adopted in the interim rule, instead of the six percent dividend to which they were entitled.

58.     On November 23, 2016, the Board of Governors published in the Federal Register a final rule adopting the interim rule without modification.

59.     On December 30, 2016, the San Francisco Reserve Bank paid a dividend to Washington Federal of $298,295.36 based on a dividend rate of 2.485%, per annum, which was approximately $421,934.89 lower than the dividend payment to which Washington Federal was entitled.  *See* Ex. E.  This payment breached the San Francisco Reserve Bank's agreement to pay Washington Federal a dividend "at the statutory rate of 6 percent per annum, or $1.50 per share semi-annually."  *See* Ex. B.

60.     Member bank stockholders with assets over $10 billion also received a dividend payment on December 30, 2016 calculated based on the 2.485% rate established in the FAST Act and adopted in the final rule, instead of the six percent dividend to which they were entitled.

61.     In 2016, Washington Federal received dividends totaling $502,471.53 when it was legally entitled to approximately $1,440,005.25.  The San Francisco Reserve Bank thus paid Washington Federal approximately $937,534.72 less than it should have paid.

62.     The Government, through the Federal Reserve Banks, paid member bank stockholders with assets greater than $10 billion approximately $590 million in dividend payments in 2016 at rates of 1.702% per annum and 2.485% per annum, respectively.  These member bank stockholders were legally entitled to approximately $1.69 billion in dividend payments at the rate of six percent per annum.  The Federal Reserve Banks thus paid member bank stockholders approximately $1.1 billion less than they should have paid.

63.     In 2016, the lower dividend rate resulted in approximately $1.1 billion in savings for the Federal Reserve Banks, which transferred these funds to the United States Treasury to pay for the FAST Act's transportation improvements.

## CLASS ALLEGATIONS

64.     Pursuant to Court of Federal Claims ("COFC") Rule 23, Washington Federal brings this action on behalf of all banks with more than $10 billion in assets that acquired stock in the Federal Reserve Banks before December 4, 2015, and received at least one dividend payment of less than six percent per annum in 2016 or any year thereafter.

65.     The requirements of COFC Rule 23(a) are satisfied.

66.     Members of the Class are so numerous that joinder of all members is impracticable.  As of September 30, 2016, there were 72 banks with more than $10 billion in

assets that acquired stock in the Federal Reserve Banks before December 4, 2015, and received at least one dividend payment of less than six percent per annum. All Class members are ascertainable from the Government's records.

67.     Common questions of law and fact exist as to all Class members. All of the Class members had materially identical contracts with the Federal Reserve Banks entitling them to a six percent annual dividend on paid-in capital stock. All of the Class members had their dividends reduced by an equal percentage by the FAST Act and related regulations, such that damages are calculated in the same way for each Class member. And each Class member will face common legal questions, including, without limitation:

(a)     Whether the Government breached the contracts entered into by its instrumentalities by reducing the dividend payments owed to Class members under these contracts;

(b)     Whether the Government breached the implied duty of good faith and fair dealing by reducing the dividend payments owed to Class members under these contracts; and

(c)     Whether the Government appropriated Class members' property without just compensation in violation of the United States Constitution.

Common questions of law and fact predominate over any questions unique to any member bank.

68.     Washington Federal's claims are typical of those of other Class members. The Government's actions alleged herein have impacted Class members equally because such actions have been directed at the member bank stockholders as a whole. Accordingly, Washington Federal's claims against the Government based on the conduct alleged herein would be identical to the claims of other Class members.

69.     Washington Federal will fairly and adequately protect the interests of Class members. Since 2013, Washington Federal has been a member bank stockholder of the Federal Reserve System and is positioned fairly and adequately to protect the interests of the Class.

Washington Federal's interests here do not conflict with the interests of the other Class Members, and Washington Federal has no interests antagonistic to the other Class Members.

70.     Washington Federal is committed to prosecuting this action to a final resolution and has retained experienced and competent class counsel.

71.     Washington Federal seeks class certification under COFC Rule 23(b)(2) because the United States has acted or refused to act on grounds generally applicable to the Class by enacting the FAST Act and related regulations.

72.     Washington Federal seeks class certification under COFC Rule 23(b)(3) because, as described above, common questions of fact and law predominate over any individual issues, and a class action is superior to other methods of adjudicating the controversy.

73.     Washington Federal does not know of any other litigation concerning this controversy already commenced against the Government by any member of the Class. Individualized litigation would present the potential for varying, inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues.  In contrast, the conduct of this matter as a class action presents fewer management difficulties, conserves the resources of the parties and the court system, promotes judicial economy and efficiency, and would protect the rights of each member of the Class.  Washington Federal knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I
### (Breach of Contract)

74.     Plaintiffs incorporate each and every preceding allegation as if set forth herein.

75.     Washington Federal and all other member bank stockholders have valid contracts with the Government.

-19-

76.     Washington Federal and all other member bank stockholders performed their obligations under the contracts by paying the requisite amounts to purchase Federal Reserve Bank stock, agreeing to keep the requisite amounts on call, and submitting themselves to enhanced regulatory oversight.

77.     The Government has a contractual obligation to pay a six percent dividend to Washington Federal and all other member bank stockholders.

78.     The Government breached the contracts by paying less than a six percent dividend to Washington Federal and other member bank stockholders with more than $10 billion in assets and will continue to breach the contracts each time it pays a dividend of less than six percent.

79.     Washington Federal and other member bank stockholders have suffered damages as a result of the Government's breach and will continue to suffer damages each time the Government pays a dividend of less than six percent.  In 2016, Washington Federal suffered damages of approximately $937,534.72, and the member bank stockholders suffered damages of approximately $1.1 billion, or an amount to be proven at trial.

## COUNT II
### (Violation of Implied Duty of Good Faith and Fair Dealing)

80.     Plaintiffs incorporate each and every preceding allegation as if set forth herein.

81.     Washington Federal and all other member bank stockholders reasonably anticipated that the Government would continue to pay a six percent dividend because the Federal Reserve Banks had paid a six percent dividend to their member bank stockholders for over 100 years and six percent was a reasonable rate of return for Federal Reserve Bank stock over time.

82.     The Government acted in bad faith by reducing the dividend rate paid to Federal Reserve Bank stockholders with assets exceeding $10 billion from six percent to the lesser of "the rate equal to the high yield of the 10-year Treasury note auctioned at the last auction held prior to the payment of such dividend" and six percent.

83.     The Government did not make a broad and general change in the law because it specifically targeted the 72 Federal Reserve Bank stockholders with assets exceeding $10 billion (1.2% of the nation's 5,980 banks).

84.     Neither Washington Federal nor any other member bank stockholder could have reasonably anticipated a change in the law specifically targeting the 72 Federal Reserve Bank stockholders with assets exceeding $10 billion.

85.     The Government destroyed the reasonable expectations of Washington Federal and other member bank stockholders regarding the benefits of purchasing Federal Reserve Bank stock.

86.     By reducing the dividend rate, the Government breached the implied covenant of good faith and fair dealing inherent in the Government's contracts with Washington Federal and other member bank stockholders and will continue to breach the implied covenant each time it pays Washington Federal and other member bank stockholders a dividend of less than six percent.

87.     Washington Federal and other member bank stockholders have suffered damages as a result of the Government's breach and will continue to suffer damages each time the Government pays a dividend of less than six percent.  In 2016, Washington Federal suffered damages of approximately $937,534.72, and the member bank stockholders suffered damages of approximately $1.1 billion, or an amount to be proven at trial.

## COUNT III
### (Violation of Takings Clause)

88.     Plaintiffs incorporate each and every preceding allegation as if set forth herein.

89.     The Fifth Amendment to the United States Constitution prohibits the Government from taking private property without just compensation.

90.     Washington Federal and all other member bank stockholders have private property interests in their contractual and statutory rights to receive a six percent dividend on Federal Reserve Bank stock and in their capital investments in Federal Reserve Bank stock.

91.     Washington Federal and all other member bank stockholders have reasonable investment-backed expectations in receiving a market rate of return on the capital they invested in Federal Reserve Bank stock equal to the six percent annual dividend promised to them in the Federal Reserve Act and in their agreements with the Federal Reserve Banks.

92.     By limiting the dividend that Federal Reserve Banks pay to member bank stockholders with assets exceeding $10 billion, and by causing the Federal Reserve Banks to pay a dividend that is less than six percent, the Government deprived Washington Federal and other member bank stockholders of the value of their investments in Federal Reserve Bank stock and effected a taking of their property interests in the promised six percent dividend without just compensation, in violation of the Fifth Amendment to the Constitution.

93.     In the alternative, the Government's substantial reduction in the interest paid on capital that Washington Federal and all other member bank stockholders invested in Federal Reserve Bank stock with the expectation of receiving a six percent return on the investment constitutes a taking of their capital investments in Federal Reserve Bank stock without just compensation in the form of a market return on the invested capital.

94.     The Government's failure to pay just compensation for the reduction in Federal Reserve Bank dividends has a significant adverse economic impact on Washington Federal and other member bank stockholders.

95.     The Government used the proceeds from the reduction in Federal Reserve Bank dividends to pay for public transportation infrastructure projects that have no relation to the Federal Reserve System and could not have been reasonably foreseen by Washington Federal and other member bank stockholders when they invested capital in Federal Reserve Bank stock and the Federal Reserve Banks agreed to pay a six percent dividend.

96.     Washington Federal and other member bank stockholders are entitled to recover damages from the Government equal to the value of the reduction in dividends paid by the Federal Reserve Banks pursuant to the FAST Act.   In 2016, Washington Federal suffered damages of approximately $937,534.72, and the member bank stockholders suffered damages of approximately $1.1 billion, or an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

a.     An order certifying the Class and appointing Washington Federal as the representative of the Class and appointing the law firm representing Washington Federal as counsel for the Class;

b.     entry of a judgment in favor of Plaintiffs and all Class members and against Defendant on all of Plaintiffs' claims;

c.     entry of a judgment that Defendant has breached its contracts with Washington Federal and other member bank stockholders, taken the stockholders' property within the

meaning of the Fifth Amendment to the United States Constitution, and breached its implied covenant of good faith and fair dealing;

   d.  entry of a judgment awarding Plaintiffs and all Class members their full and reasonable damages, in an amount to be proven at trial, for Defendant's breach;

   e.  entry of judgment awarding Plaintiffs and all Class members their full and just compensation, in an amount to be proven at trial, for Defendant's unconstitutional taking of Plaintiffs' property;

   f.  an accounting for damages suffered by Plaintiffs and all Class members and judgment requiring Defendant to compensate Plaintiffs and all Class members for such damages;

   g.  entry of a judgment declaring that each failure by Defendant to pay dividends at a rate of six percent shall constitute a breach of contract, a violation of the implied covenant of good faith and fair dealing, and a taking without just compensation in violation of the Fifth Amendment to the United States Constitution;

   h.  an award of any pre-judgment and post-judgment interest, costs, expenses, and attorneys' fees to which Plaintiffs may be entitled;

   i.  such other and further relief as the Court may deem just and proper.

Respectfully submitted,

WILEY REIN LLP

/s/ Brett A. Shumate
Brett A. Shumate
1776 K Street N.W.
Washington D.C. 20006
Tel. (202) 719-7000
Fax (202) 719-7049
bshumate@wileyrein.com

*Of Counsel:*
Michael E. Toner
Jon W. Burd
Stephen J. Obermeier
Ari Meltzer
Stephen J. Kenny
1776 K Street N.W.
Washington D.C. 20006
Tel. (202) 719-7000
Fax (202) 719-7049

*Counsel for American Bankers Association and
Washington Federal, N.A.*

April 14, 2017